UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Nasir 'Abd al-Baqi,

Petitioner,

vs.

Rob Mundt, Warden,

Respondent.

ORDER
and
REPORT AND RECOMMENDATION

Civ. No. 00-1449(JMR/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 5th day of June, 2001.

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(A) and (B), upon a Petition for a Writ of Habeas Corpus, see, Title 28 U.S.C. §2241, which alleges that the Petitioner is being illegally detained, by the Respondent, for reasons which are violative of his rights under the Constitution, laws, or Treaties of the United States. The Petitioner has appeared pro se, and the Respondent has appeared by David P. Steinkamp, Assistant United State Attorney.

For reasons which follow, we recommend that the Petition for Writ of Habeas Corpus be denied.

20 21

FILED JUN 05 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## II. Factual and Procedural Background

The Petitioner is currently confined at a half-way house in Robbinsdale, Minnesota. See, Petitioner's Notice of Change of Address. He is presently serving the remainder of a 140-month sentence for Conspiracy to Distribute Cocaine, Possession with Intent to Distribute Cocaine, and the Use of a Firearm in Drug Trafficking. See, Petition for Writ Habeas Corpus, at ¶¶1, 2 and 3.

The Petitioner believes that the Bureau of Prison's ("BOP's") mandatory tuberculosis ("TB") testing, through the use of the Mantoux, or Purified Protein Derivative ("PPD") test, violates his constitutional rights. For a complete recitation of the back ground, and diagnosis of TB, including the susceptibility of TB outbreaks in a prison setting, see DeGidio v. Pung, 704 F. Supp. 922, 924-28 (D. Minn. 1989). For the purposes of this Petition, however, we will briefly recite some of the DeGidio Court's observations on TB and the PPD test:

> [TB] is an infectious disease caused by the transfer of tubercle bacilli. It is transmitted through airborne droplets expelled from the lungs of an infected person through talking, coughing, sneezing, or the like. [TB] infection usually results after a prolonged period of sharing air with someone contaminated with an active case of infectious pulmonary [TB]. It usually manifests itself in the lungs, but may occur in other organs such as lymph nodes or bones. Infectious [TB] disease

> is not common in the United States. It is most prevalent among members of lesser-advantaged socio-economic classes. Prisons are considered high risk environments for the transmission of [TB].
>
> There is a distinction between [TB] infection and disease. [TB] infection means that tubercle bacilli have become established in the body, but are dormant. A person who is merely infected is not infectious to others. Infectiousness develops when the infection breaks down into active disease and becomes established in the lungs. This breakdown into active disease can usually be prevented by a course of preventive antibiotic therapy.
>
> Left untreated, only a small percentage of infected persons will ever go on to develop the active disease. The risk grows for untreated infected persons, however, when certain other conditions develop. These conditions include diabetes, HIV infection (AIDS), or other illnesses which cause immunosuppression. Although the risk is greatest in the first year after infection, it is life-long without antibiotic preventive therapy.
>
> The preferred screening tool for [TB] is the Mantoux skin test. The Mantoux test involves injecting a precise amount of purified protein derivative of tuberculin (PPD) under the skin on the patient's forearm. The test site is examined 48-72 hours later. A hard swelling reaction, or induration, of 10 millimeters or more is considered significant and means that the individual is infected with [TB]. A reaction of less than 10 millimeters in an adult is considered not positive.[1] Mere redness, or

---

[1]Individuals who reveal an induration of five millimeters or more, and have an HIV infection, abnormal chest x-ray, or contacts with active cases of TB, are now considered positive. See, Karolis (continued...)

> erythema, without induration is not generally considered evidence of infection regardless of its size.

See, DeGidio v. Pung, supra at 924-25.

As noted by the DeGidio Court, an individual who is merely infected, but does not have the active disease,[2] is not contagious. Id. Moreover, even if an individual does have the active disease, limited exposure with others will not normally transmit the disease. Rather, "[a] continuous respiratory exposure to an individual with active TB is necessary for the disease to spread to another individual." Karolis v. New Jersey Depart. of Corrections, 935 F. Supp. 523, 528 (D.N.J. 1996). "Thus, a confined prison setting is precisely the type of environment where TB is likely to spread easily and rapidly." Id.

Once an individual has a positive PPD test, he is usually tested to determine if he has the active disease, first by a chest

---

(...continued)
v. New Jersey Depart. of Corrections, 935 F. Supp. 523, 529 (D.N.J. 1996); see also, Theodore M. Hammett, Ph.D., United States Department of Justice, Tuberculosis in Correctional Facilities, at 19 (1994), Attachment 7 to United States Attachments 1-13 [Docket No. 13].

[2]According to the DeGidio Court, "[t]he onset of active [TB] is generally gradual and often includes such symptoms as loss of weight, loss of appetite, fatigue, night sweats, chills, coughing, elevated temperature, and production of sputum which may be bloody." DeGidio v. Pung, 704 F. Supp. 922, 925 (D. Minn. 1989). The symptoms for active TB may also be "nonspecific" though, and there are times when a person with active TB may be asymptomatic. Id.

x-ray, and then by a sputum smear or culture. See, DeGidio v. Pung, supra at 925. Only a sputum smear or culture can definitely diagnosis active TB, although it is normally only ordered when there is an abnormal or questionable chest x-ray. Id. If there is no sign of the active disease, then an individual can be started on a preventative treatment of isoniazide ("INH"), with the regime normally lasting between nine to twelve months. Id. at 926. If an infected person, who does not have active TB, finishes the INH regime, he is unlikely to ever develop the active disease. Id.

According to the BOP Program Statement 6000.05 ("P.S. 6000.05"), the PPD test is required of all inmates at intake, and the test is valid for one year. See, P.S. 6000.05, at Chapter VI, p. 6. If there is a contraindication for the PPD test, then a chest x-ray is used. Id. If an inmate refuses a TB screening, he is not placed in medical isolation, unless there is a clinical indication for such isolation. Id. Rather, the inmate is subject to an incident report for failure to follow an order, and can be placed in administrative detention or segregation. Id.[3]

[3]Apparently, if an individual is believed to be at risk for having TB, he may be placed in quarantine or isolation "until such time as [the inmate] is assessed to be non-communicable or the attending physician determines the inmate poses no health threat if returned to the general population." See, Reynolds v. Goord, 103 F. Supp.2d 316, 325 (S.D.N.Y. 2000), quoting BOP P.S. 6190.02. If isolation is not practicable, and an inmate is refusing diagnostic (continued...)

On August 2, 1999, the Petitioner went to the Health Services Unit at the Federal Correctional Institution in Waseca, Minnesota ("FCI-Waseca"), for his mandatory annual TB screening test -- the PPD test. The Petitioner refused to allow the test to be done, however, even after staff had shown him the Program Statement mandating annual TB testing of all inmates unless there is a contra-indication. The Petitioner did not have a contraindication for performing the PPD test. According to the Respondent, failure to have the test done placed the Petitioner at risk for having an undetected TB infection, which also placed institution staff and other inmates at risk. Pursuant to prison policy, the Petitioner was then subject to disciplinary action for refusal to accept a program assignment. The Unit Disciplinary Committee ("UDC") sanctioned him with fifteen days loss of commissary privileges. See, Declaration of Susan Pedersen, at ¶4, Attachment 10 to United States' Attachments 1-13 [Docket No. 13].

The Petitioner's refusal to submit to the PPD test was based upon his belief that, to submit to the test, would violate the Islamic concept of purity. The BOP Chaplain, Imam Abdul-Hafiz, has advised that there is no Islamic restriction related to the PPD

---

(...continued)
procedures, he can be involuntarily evaluated. Id., quoting BOP P.S. 6190.02.

test. See, Memorandum from Michael A. Longanecker, Chaplain, dated August 4, 1999, Attachment 4 to United States' Attachments 1-13 [Docket No. 13]. The Health Services Administrator, Alan Jorgenson, also consulted with the Chaplain at FCI-Waseca, and a representative of the Islamic religion who confirmed that there is no foundation for the Petitioner to refuse the PPD based upon religious beliefs. See, Letter from Abdul Alim Muhammad, M.D., Minister of Health, Nation of Islam, dated May 12, 1993, Attachment 5 to United States' Attachments 1-13 [Docket No. 13].

On August 8, 1999, the Petitioner again refused to allow the PPD test to be performed. Upon a finding that the Petitioner had again committed the offense of Refusing to Accept a Program Assignment, the UDC sanctioned him to loss of job. See, Declaration of Susan Pedersen, at ¶5, Attachment 10 to United States' Attachments 1-13 [Docket No. 13].

On August 17, 1999, a third incident report was written because the Petitioner again refused to allow the PPD test to be performed. Medical staff at FCI-Waseca had explained to the Petitioner on several occasions that the PPD test is mandatory for all Federal inmates as outlined in the BOP P.S. 6000.05. The Unit Disciplinary Committee referred the matter to the Discipline Hearing Officer ("DHO"). After a DHO factfinding Hearing, the Petitioner was found to have again committed the prohibited act of Refusing to

Accept a Program Assignment, and was sanctioned to seven days loss of good conduct time, and fifteen days of disciplinary segregation. See, Declaration of Susan Pedersen, at ¶6, Attachment 10 to United States' Attachments 1-13 [Docket No. 13].

On September 29, 1999, an incident report was written against the Petitioner for again refusing to accept the PPD test. Following a DHO Hearing on October 18, 1999, wherein the Petitioner was again found to have committed the prohibited act of Refusing to Accept a Program Assignment, the Petitioner was sanctioned with loss of good conduct time of seven days, and disciplinary segregation for fifteen days. See, Declaration of Susan Pedersen, at ¶7, Attachment 10 to United States' Attachments 1-13 [Docket No. 13]. Prior to this final Hearing, but after the incident report was written, the Petitioner did finally accede to the PPD test.

The Petitioner has now brought this Petition for Writ of Habeas Corpus, contending that the BOP denied him free exercise of religion when he refused to submit to the PPD test and, thereafter, received disciplinary infractions and sanctions for his failure to accept a program assignment. The Petitioner asserts that his Islamic beliefs would be violated by the invasive nature of the test. His allegations are based on the First, Fifth, Eighth, and Fourteenth Amendments, as well as the Religious Freedom Restoration Act ("RFRA"). The Petitioner is requesting to have his good conduct

time restored, his incident reports expunged, and his status in housing and work assignments restored.[4] He is also requesting a permanent injunction which would forbid the BOP from testing him via the PPD test.

## III. Discussion

A. The Petitioner's RFRA Claim. The Petitioner contends that Defendant violated his rights under RFRA when they took disciplinary action against him due to his refusal to submit to the PPD test. We find the Petitioner's claim unpersuasive.

1. Standard of Review. The operative Section of RFRA provides as follows:

> (a) In general. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

---

[4]The Respondent's initial assertion, as to why this Habeas Petition should be dismissed, is that a Habeas Corpus Petition is the wrong vehicle for the Petitioner to assert his complaints. A Petition for Writ of Habeas Corpus is generally limited to charges which attack the fact or duration of confinement. See, Kruger v. Erickson, 77 F.3d 1071, 1071 (8th Cir. 1996). The only portion of the Petitioner's sought-after relief, which meets that criteria, is his request that his good time credit be restored. Nonetheless, while the Writ is generally limited to challenges which attack the fact or the duration of confinement, the law of this Circuit authorizes the use of the Writ in order to challenge the conditions of confinement -- so long as the Petitioner has alleged "a substantial infringement of a constitutional right." Albers v. Ralston, 665 F.2d 812, 815 (8th Cir. 1981), quoting Willis v. Ciccone, 506 F.2d 1011, 1019 (8th Cir. 1974). Under this doctrine, we will review the Petitioner's Petition in total.

> (b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person --
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

Title 42 U.S.C. §2000bb-1.

The purpose of RFRA was to ensure greater religious freedom to all Americans, including prisoners. See, Hamilton v. Schriro, 74 F.3d 1545, 1552 (8th Cir. 1996). The Act generally forbids the government from imposing any "substantial burden" on a person's ability to exercise his or her religious beliefs, unless the government can demonstrate that: 1) there is some "compelling governmental interest" at stake; and 2) the "least restrictive means" have been used to further that interest. Id. at 1551-52. The Supreme Court, in both Sherbert v. Verner, 374 U.S. 398 (1963), and Wisconsin v. Yoder, 406 U.S. 205 (1972), in which Justices Brennan and Burger formulated the antecedent to RFRA's standard, recognized and distinguished those cases in which the Government's paramount interest was in preserving public safety, peace, or order. See, Wisconsin v. Yoder, supra at 205; Sherbert v. Verner, supra at 403.

2. Legal Analysis. A person seeking to invoke the protections of RFRA against governmental action must, as an initial

matter, "establish that the action substantially burdens his sincerely held religious belief." Weir v. Nix, 114 F.3d 817, 820 (8th Cir. 1997); Ochs v. Thalacker, 90 F.3d 293, 296 (8th Cir. 1996). Our Court of Appeals has extrapolated, from RFRA, what constitutes a "substantial burden" on free exercise rights, under the Act, as follows:

> In order to be considered a "substantial" burden, the governmental action must 'significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.'

Weir v. Nix, supra at 820, quoting In re Young, 82 F.3d 1407, 1418 (8th Cir. 1996), vacated on other grounds sub nom. Christians v. Crystal Evangelical Free Church, 521 U.S. 1114 (1997), quoting in turn Werner v. McCotter, 49 F.3d 1476, 1480 (10th Cir. 1995).

The Respondent does not argue that the mandatory PPD test does not substantially burden the Petitioner's free exercise of his religion.[5] Rather, it appears that this is exactly the type of case

[5]Although the Respondent presents evidence that the Petitioner's stated belief, that the PPD test violates the Islamic tenet of purity, is not consistent with the Islamic religion, the Petitioner contends that the Respondent's evidence regarding the basis for his religious belief is not conclusive, as the evidence presented is not from his religion -- al-Islam -- but is, rather, in regard to the Nation of Islam, of which he contends that he is not a member. See, Written Response to UDC, Attached to Petition for Writ of Habeas Corpus. Moreover, the Petitioner does present a letter from A.S. Desai, which is dated February 23, 2000, and (continued...)

which is targeted by RFRA. The Petitioner is being forced to chose between following his asserted religious beliefs, or submitting to a mandatory PPD test, in order to avoid disciplinary action. See, Sherbert v. Verner, supra at 404 (finding substantial burden where individual is forced to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion * * * on the other hand"); Jolly v. Coughlin, 76 F.3d 468, 476 (2nd Cir. 1996) (determining that forcing a Rastafarian to submit to PPD testing is a substantial burden, in the context of a Motion for Preliminary Injunction); Karolis v. New Jersey Depart. of Corrections, supra at 526 (finding that forcing a Christian Scientist to submit to the PPD test constitutes a substantial burden). Thus, we turn to whether the Respondent has demonstrated that some "compelling governmental interest" was at stake when the Petitioner exercised his religious beliefs and, if so, whether the Government used the "least restrictive means" to pursue that interest.

a. The Compelling Governmental Interest. The Petitioner contends that the Respondent has failed to show that

---

(...continued)
which asserts that "[t]he TB and other types of injections are not permissible in Islam." See, Exhibit 1, attached to Petitioner's Memorandum of Law in Support of Petition for Writ of Habeas Corpus. The Respondent does not appear to contest this issue.

there is a compelling governmental interest at stake in regard to the mandatory TB testing program. His assertion, however, is contradicted by the weight of authority. The Respondent posits that there is a compelling governmental interest in providing for the safety and health of institutional staff, and of other inmates, by protecting them from TB. Indeed, other Courts have found such an interest to be compelling. See, Jolly v. Coughlin, supra at 477; Jones-Bey v. Wright, 944 F. Supp. 723, 738 (N.D. Ind. 1996), citing Jihad v. Wright, 929 F. Supp 325, 330 (N.D. Ind. 1996); Karolis v. New Jersey Depart. of Corrections, supra at 526-27. As well, our own Court of Appeals has determined that the failure to provide an effective TB control and treatment program violates the Eighth Amendment protection against cruel and unusual punishment. See, DeGidio v. Pung, supra 954-60, aff'd. 920 F.2d 525 (8th Cir. 1990). Moreover, we take particular note of the fact the TB infection is closely associated with the epidemic of HIV/AIDS, and particularly afflicts the poor, innercity minorities, and injection drug users. As these populations are overrepresented in the correctional setting, TB is a serious problem. See, Theodore M. Hammett, Ph.D., United States Department of Justice, Tuberculosis in Correctional Facilities, Attachment 7 to United States' Attachments 1-13 [Docket No. 13]; see also, Reynolds v. Goord, 103 F. Supp.2d 316, 319 (S.D.N.Y. 2000)("TB is relatively common among * * * those who

reside in correctional institutions * * *."); Karolis v. New Jersey Depart. of Corrections, supra at 528 ("Although * * * only about eight percent of those who test posi-tive on the Mantoux test develop active TB, this figure is higher in a prison setting, where people live in close quarters and where a higher proportion of the population is HIV positive."). Thus, we find that the Respondent's asserted interest, in protecting the safety and health of institution staff and inmates, by providing for an effective TB control and treatment program, is a compelling governmental interest. Therefore, we turn to whether the administration of the PPD test is the least restrictive alternative for carrying out that interest.

b. The Least Restrictive Alternative. Under Section (B)(1) of RFRA, the Government has the burden of proving that no less restrictive means of achieving the compelling interest existed. See, Weir v. Nix, supra at 820; Hamilton v. Schriro, supra at 1552. In assessing the Respondent's showing, we are mindful of our Court of Appeals' instruction that we are to "continue to defer 'to the expertise of prison officials in establishing regulations to maintain prison safety and security * * *.'" Weir v. Nix, supra at 820 n. 6, quoting Hamilton v. Schriro, supra at 1554. RFRA's legislative history confirms that Congress intended the Courts to "continue the tradition of giving due deference to

the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." S.Rep. No. 111, 103d Cong., 1st Sess., at 10 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1900. Therefore, "[a]lthough RFRA places the burden of production and persuasion on the prison officials, once the government provides this evidence, the prisoner must demonstrate what, if any, less restrictive means remain unexplored." Hamilton v. Schriro, supra at 1556.

Given these principles, we conclude that the Respondent has satisfied the least restrictive means standard by his actions in this case. The measures implemented, in order to provide for the safety of both inmates and other staff, against the spread of TB, are the least restrictive alternative. Specifically, the PPD test will indicate whether a person has been exposed to TB. Although the Petitioner believes that a chest x-ray, or a sputum culture, would also serve this purpose, and would, therefore, constitute a less restrictive alternative than the PPD test, such methods would only detect whether a person has active TB. Thus, those methods are used once an individual has tested positive through the PPD. The chest x-ray or sputum test would not test, however, whether a person has latent, or dormant TB. "This distinction is critical."

Karolis v. New Jersey Depart. of Corrections, supra at 529. "By the time an x-ray shows signs of TB, the infected individual may have been spreading the disease to other inmates, whereas a positive [PPD] test would trigger preventative therapy." Id.

Moreover, once the latent TB is caught, the individual may be placed on preventative therapy, such as INH, and once the therapy is completed, there is little risk of developing active TB. See, DiGido v. Pung, supra at 926. As explained in a public health report on TB, "[t]he screening of high-risk populations for latent tuberculosis infection and the provision of treatment of latent infection have been recognized for more than a decade as being central to the goal of tuberculosis elimination." See, Reynolds v. Goord, supra at 321, quoting Institute of Medicine, Ending Neglect: The Elimination of Tuberculosis in the United States, at 34 (Lawrence Geiter ed., 2000). Finally, we note, as pointed out by the Respondents, that the last decade has seen a new type of TB infection that is resistant to drug treatment, which heightens the need to detect and treat latent TB. See, Government's Response to Petitioner's Petition for Writ of Habeas Corpus, at 7 n.4, citing Theodore M. Hammeett, Ph.D., United States Department of Justice, Tuberculosis in Correctional Facilities (1994), see also, Reynold v. Goord, supra at 323 (discussing drug resistant TB).

The Petitioner points to the Court of Appeals for the Second Circuit's decision in Jolly v. Coughlin, supra, as support for his position, however. In Jolly, the Court was analyzing the use of a "medical keeplock," in light of RFRA, when an inmate refused to submit to the PPD test due to religious reasons. Id. at 473-480. As noted by the Court, though, there was no actual medical significance for medical keeplock. Id. at 471. Those who refused to submit to the Mantoux test for latent TB would continue to share the same breathing space as other inmates. Id. Unlike inmates with "active" TB, the plaintiff, in Jolly, was not placed in "respiratory isolation." Id. Moreover, it was the prison's policy that inmates who took the screening test, and who were found to carry latent TB, would not be placed in either "medical keeplock," or respiratory isolation. Id. Thus, the Court of Appeals found that the prison offered no basis for concluding that the plaintiff's continued confinement, in an unisolated yet segregated area, would serve the compelling interest of administering an effective TB screening program. Id. The Court opined that a less restrictive alternative, than placing the inmate in the "medical keeplock," would be to treat him as an inmate at risk -- requiring him to submit to periodic chest x-rays and sputum samples. Id.

In contrast, the Court in Karolis v. New Jersey Depart. of Corrections, supra,[6] determined that administering the PPD test, and the sanctions imposed on an inmate for refusing to take the test, were the least restrictive alternative necessary to administer an effective TB control program. In that case, a Christian Scientist refused to submit to the PPD because it violated his religious beliefs which opposed intrusive medical procedures. Id. at 525. Due to his refusal, he received a disciplinary charge, was found guilty and, consequently, lost seven days of privileges. Id. The plaintiff refused the test on a second occasion, and consequently lost another seven days of privileges. Id. After the second refusal, the plaintiff was allegedly threatened with solitary confinement, administrative segregation, and the loss of commutation time if he again refused the test. Id. Thereafter, he did submit to the PPD test. Id. On another occasion, though, after being transferred to a different prison, the plaintiff again refused the test, and was consequently threatened with solitary confinement and administrative segregation. Id. At that point, he

[6]Both Jolly v. Coughlin, 76 F.3d 468 (2nd Cir. 1996), and Karolis v. New Jersey Depart. of Corrections, 935 F. Supp. 523 (D.N.J. 1996), involved State correctional institutions, and were decided prior to the Supreme Court's holding, in City of Boerne v. Flores, 521 U.S. 507 (1997), that RFRA was unconstitutional as applied to the States, because Congress exceeded its enforcement powers, under Section 5 of the Fourteenth Amendment.

brought suit asserting that the test violated his rights under RFRA, the First Amendment, and under various State claims. Id. The Court found that the administration of the PPD did not violate RFRA, as there was a compelling governmental interest -- preventing the spread of TB in prisons by the detection, at the earliest possible opportunity, and that administration of the PPD test, which detects latent TB, was the least restrictive means for furthering that interest. Id. at 527-29.

In regard to the Karolis plaintiff's assertion, with Jolly v. Coughlin, supra, as his authority, that the sanctions imposed on him did not further the compelling government interest in preventing the spread of TB, the Court stated:

> The Court recognizes two crucial distinctions between Jolly and the instant case. First, in Jolly, the plaintiff was placed in medical keeplock indefinitely. Jolly, 76 F.3d at 472. He remained in medical keeplock for three and one-half years, except for weekly ten-minute showers, and he filed his complaint to seek release, claiming that the conditions of his confinement were causing him to suffer from headaches, hair loss, rashes, and an inability to stand or walk without difficulty. Id. In the instant case, the record shows that plaintiff was not confined to administrative segregation, but did lose privileges twice, for seven days on each occasion. Plaintiff is not seeking an injunction for release from administrative segregation, but rather an injunction which would prevent further segregation.
>
> In Jolly the confinement used to compel compliance offered no medical protection. [New

> Jersey Department of Corrections], by way of contrast, has clearly indicated that any inmate who persists in refusing the TB screening test will be placed in respiratory isolation. Therefore, although the threat of confinement is calculated to produce compliance with prison policy, it also serves the penological interest of preserving the health of inmates and prison employees.

Karolis v. New Jersey Depart. of Corrections, supra at 530.

We agree with the Court's reasoning in Karolis. As already explained, the PPD test does serve the compelling governmental interest of providing an effective TB control program, which protects both staff and inmates, as it detects latent TB. Moreover, the sanctions taken again the Petitioner were designed to elicit compliance with the mandatory testing and, if he would have persisted in his refusal of the test, and he was believed to be infected, the BOP could have isolated him, until it was determined that he was not infected, or could have made him take the test involuntarily. See, Reynolds v. Goord, supra at 325, citing BOP P.S. 6190.02. Thus, we believe that the BOP's mandatory PPD testing, and the sanctions it imposed for the Petitioner's failure to comply with the directive, do not violate RFRA. Therefore, we recommend that his Petition for Writ of Habeas Corpus, in regard to his RFRA claim, be denied.

B. The Petitioner's Free Exercise of Religion Claim. Apart from RFRA, the Petitioner contends that the Respondent has violated

his First Amendment right to freely exercise his religious beliefs, when he was disciplined for refusing to take the PPD test. In light of our disposition of the Petitioner's RFRA claim, which undeniably exposes the BOP actions to a higher level of judicial scrutiny, the Petitioner's First Amendment claim is unsustainable.

a. Standard of Review. It is settled law that prisoners do not automatically forfeit all of their constitutionally protected freedoms upon entering a correctional facility. See, Bell v. Wolfish, 441 U.S. 520, 545 (1979); Pell v. Procunier, 417 U.S. 817, 822 (1974). At the same time, "'[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration.'" Hamilton v. Schriro, supra at 1550, quoting Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977). The administration of a prison "requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government" which, even in the context of a constitutional challenge, raises "separation of powers concerns [that] counsel a policy of judicial restraint." Turner v. Safley, 482 U.S. 78, 84-85 (1987).

When an inmate claims that prison officials have interfered with his constitutional right to exercise his religious beliefs,

the Court must apply a "'reasonableness test'," which is "'less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.'" Hamilton v. Schriro, supra at 1550, quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987). Prison officials need not show that they have chosen the least restrictive means of furthering a compelling governmental interest; they must only show that they have chosen a "reasonable" means of furthering a "'legitimate penalogical interest'." Id., quoting O'Lone v. Estate of Shabazz, supra at 89; see also, Jolly v. Coughlin, supra at 475 ("the O'Lone 'reasonableness' test continues to have validity for claims brought directly under the First Amendment"); Karolis v. New Jersey Dept. of Corrections, supra at 530 ("While free exercise claims brought by prison inmates under RFRA are subject to the strict compelling interest test, free exercise claims brought outside RFRA are subject only to a 'reasonableness' test"). Needless to say, if prison officials can establish that their actions constitute the "least restrictive means" of furthering a "compelling governmental interest," under RFRA, they will necessarily be able to satisfy the less demanding standard of showing that their actions are merely a "reasonable" effort to address a "legitimate penalogical interest." Hamilton v. Schriro, supra at 1550 ("If the State meets the RFRA standards * * * then it clearly meets the 'reasonably related' standard").

b. Legal Analysis. As the Petitioner's RFRA claims have been rejected, his purely constitutional claims may be resolved in short order. The "compelling governmental interest," which has been advanced by the Respondent -- namely, the preservation of institutional health -- clearly constitutes a "legitimate penalogical interest." Moreover, as we have determined that PPD testing is the least restrictive alternative for furthering the compelling governmental interest, then the PPD test is surely a reasonable effort at furthering the legitimate penalogical interest. Therefore, we recommend that the Petitioner's Habeas Corpus Petition, in regard to his First Amendment Claim, be denied.

C. The Petitioner's Eighth Amendment Claim. The Petitioner also contends that the BOP officials were "deliberately indifferent" to him when they attempted to get him to take the PPD test. Although the exact nature of the Petitioner's claim is far from clear, it appears that he is attempting to invoke the Eighth Amendment's prohibition on cruel and unusual punishment by a deliberate indifference to his medical needs. The Petitioner allegations do not sustain such a claim, however.

1. Standard of Review. One condition of confinement, to which the Eighth Amendment's protections attach, "is the medical attention given to a prisoner." Weaver v. Clarke, 45 F.3d 1253, 1255 (8th Cir. 1995). Of necessity, the circumstances of a pri

soner's confinement restrict the free access that he might otherwise have in securing medical treatment. In a sense, a prisoner is at the forbearance of the prison officials for the provision of health care. As a consequence, Courts have recognized that a prisoner's Eighth Amendment right to be free from cruel and unusual punishment is violated when prison officials are deliberately indifferent to a prisoner's serious medical needs. See, Bellecourt v. United States, 994 F.2d 427, 431 (8th Cir. 1993), citing Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); Bailey v. Gardebring, 940 F.2d 1150, 1155 (8th Cir. 1991); DeGidio v. Pung, supra at 531-32.

An Eighth Amendment violation exists where the medical care, which is administered with respect to a prisoner's serious medical needs, "is so grossly incompetent or inadequate that it amounts to deliberate indifference." Bellecourt v. United States, 784 F. Supp. 623, 634 (D. Minn. 1992), aff'd, 994 F.2d 525 (8th Cir. 1993), citing Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990). It is not enough that the medical care provided is negligent; that the prisoner disagrees with the prison official as to the appropriateness of the medical treatment; or that there is a delay in the treatment that does not result in substantial harm to the inmate. See, Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)("The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the

level of a constitutional violation"), quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995); Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)("Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation"); Kayser v. Caspari, 16 F.3d 280 (8th Cir. 1994)(mere disagreement with course of treatment provided is not sufficient basis for Eighth Amendment violation).

As a general proposition, prison officials have violated the Eighth Amendment "only when two requirements are met." Farmer v. Brennan, 511 U.S. 825, 834 (1994). First, the "deprivation alleged must be, objectively, sufficiently serious." Id., citing Wilson v. Seiter, 501 U.S. 294, 298 (1991); Brown v. Nix, 33 F.3d 951, 955 (8th Cir. 1994). Second, to be liable, a prison official "must have a sufficiently culpable state of mind," id., citing Wilson v. Seiter, supra at 302-03, and in cases, such as this one, a subjective standard -- namely, a "deliberate indifference" to an inmate's health and safety -- must be satisfied before a finding of liability can attach.

In Farmer, the Supreme Court elaborated upon the "deliberate indifference" standard by enunciating a "subjective test of culpability." Clark v. Armontrout, 28 F.3d 71, 72 (8th Cir. 1994). There, the Court held that "a prison official cannot be found liable under the Eighth Amendment * * * unless the official knows of

and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, supra at 832; see also, Brown v. Nix, supra at 955. In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, supra at 837. Accordingly, an official cannot be held liable for an act or omission which is unaccompanied by the knowledge of a significant risk of harm, as such action, or inaction, "cannot under [the Supreme Court's] cases be condemned as the infliction of punishment." Id.

Deliberate indifference applies, then, to the requisite state of mind of the defendant; it is apathy or unconcern. See, Oldham v. Chandler-Halford, 877 F. Supp. 1340, 1354 (N.D Iowa 1995). The specific circumstances of each case must be examined. Id. For instance, in Foulks v. Cole County, Mo., 991 F.2d 454, 446-57 (8th Cir. 1993), a delay of several days in the treatment of a bleeding and bruised prisoner raised a fact issue as to whether defendants had acted with deliberate indifference. However, a brief delay in treatment is not deliberate indifference. See, Mills v. Smith, 656 F.2d 337, 339-40 (8th Cir. 1981). Furthermore, there is no deliberate indifference when no treatment is available for a condition. See, Bailey v. Gardebring, supra at 1155.

Moreover, nothing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment. See, White v. Farrier, 849 F.2d 322, 327 (8th Cir. 1988). Prisoners do not have a constitutional right to any particular type of treatment. Id. at 327-28. So long as the independent judgment is informed, and well-intentioned, a prison doctor is not exposed to liability merely because the prescribed treatment did not produce its intended result. See, Kayser v. Caspari, supra at 281; Taylor v. Turner, 884 F.2d 1088, 1090 (8th Cir. 1989).

2. Legal Analysis. The Petitioner's asserted deliberate indifference fails because he does not satisfy the requisite state of mind on the part of the Respondent. In fact, there is no allegation that the named Respondent, the Warden at FCI-Waseca, had any knowledge, or input, into the PPD testing of the Petitioner. Such lack of evidence clearly fails to establish the subjective portion of a deliberate indifference claim. See, Farmer v. Brennan, supra at 832; Clark v. Armontrout, supra at 72; see also, Escoe v. Wankum, 21 F.3d 432, 1994 WL 131726 at *1 (8th Cir. April 14, 1994)(unpublished)(finding that forcible PPD testing does not violate the Eighth Amendment where plaintiff "has not demonstrated that the defendants' state of mind rose to the level of deliberate indifference").

In sum, the Petitioner has presented no evidence to support his claim, that the Respondent was deliberately indifferent to his medical needs and, therefore, we recommend that his Petition for Writ of Habeas Corpus be denied.

D. The Petitioner's Due Process Claims. The Petitioner also asserts that the Respondent violated his due process rights in regard to each of the disciplinary actions that the BOP took against him. Specifically, the Petitioner's claims are as follows:

> 1) [In regard to Incident Report #701399, which resulted in the Petitioner losing 15 days of commissary privileges], [t]he refusal of the FBOP officials to accord the Petitioner the necessary safeguards promulgated in RFRA has deprived the Petitioner of a defense and his Due Process Rights.
>
> 2) [In regard to Incident Report #703644, which resulted in the Petitioner losing his job placement], [t]he Due Process rights of the Petitioner has been violated by imposition of sanctions despite the valid religious objections of the Petitioner and imposition of sanctions not listed on the incident report with other sanctions.
>
> 3) [In regard to Incident Report #706765, which resulted in the Petitioner losing 7 days good conduct time, and being sentenced to 15 days of disciplinary segregation], [t]he disciplinary hearing was violative of the Petitioner's Due Process rights due to gross inaccuracies in the Disciplinary Hearing Officer's (DHO) report, refusal to allow proper questioning of witnesses, falsified and misinterpreted statements, reliance on "evidence" that was not presented to the Petitioner at the disciplinary hearing, forfeiture of Good

> Conduct Time (GCT) and confinement in Disciplinary Segregation (D/S) in disregard to the vested liberty interest of the Petitioner and selective infraction for the same alleged misconduct on two separate occasions.
>
> 4) [In regard to Incident Report #718022, which resulted in the Petitioner losing 7 days of good conduct time, and being sentenced to 15 days of administrative segregation], [t]he Petitioner's Due Process rights have been violated by forcible testing in violation of FBOP Program Statement 6000.05, Health Services Manual; Program Statement 6190.92, RFRA, the First Amendment and Supreme Court precedent. The mootness of this incident report is evidence on it's face and should have been dismissed.

See, Amended Petition for Writ of Habeas Corpus, at 3-4a.

Many of the Petitioner's contentions, under the Due Process Clause, stem from his belief that the BOP cannot make PPD testing mandatory, due to the fact that it would violate the First Amendment and RFRA. That argument, however, has already been rejected. Therefore, we need only address whether the sanctions imposed upon the Petitioner were in accordance with his right to procedural due process.

1. Standard of Review. The Fifth Amendment prohibits the Federal Government from depriving a person of life, liberty, or property, without the due process of law. While it is true that the constitutional protections, that are encompassed by the due process clause, do not abate at the time of imprisonment, see, Hudson v. Palmer, 468 U.S. 517, 539 (1984)(O'Connor, J., concur-

ring), it is also true that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Sandin v. Conner, 515 U.S. 472, 485 (1995), quoting Jones v. North Carolina Prisoners' Labor Union, Inc., supra at 125, quoting in turn Price v. Johnston, 334 U.S. 266, 285 (1948).

Although prison disciplinary proceedings often implicate liberty interests, they are not criminal Trials and, therefore, they do not involve the full panoply of procedural and substantive protections that are available in criminal proceedings. See, Wolff v. McDonnell, 418 U.S. 539, 567-68 (1974). Nevertheless, in Wolff, the Supreme Court enumerated the minimum due process requirements of a prison disciplinary proceeding as follows:

> 1. Written notice of the claimed violation must be given to the prisoner at least 24 hours prior to the hearing;
>
> 2. A written statement must be compiled by the factfinder describing the evidence relied upon and the reasons for the findings and disciplinary action;
>
> 3. The prisoner should be permitted to call witnesses and to present evidence in defense of the charges, unless doing so would jeopardize institutional safety or correctional goals; and
>
> 4. Where the inmate is illiterate, or the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate compre

> hension of the case, he should be free to seek the aid of a fellow inmate, or have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff.

Id. at 563-70.

Beyond these procedural due process considerations, the Supreme Court has determined that, in order to comply with constitutional due process, at least "some evidence" must support the finding of a disciplinary sanction. See, Superintendent v. Hill, 472 U.S. 445, 455 (1985). As explained by the Court:

> This standard is met if there is some evidence from which the conclusion of the administrative tribunal could be deduced. * * * Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

Id. at 455; see also, Goff v. Dailey, 991 F.2d 1437, 1440 (8th Cir. 1993).

The due process clause, however, does not protect against every change in the conditions of confinement which may have a substantial, adverse impact upon an inmate. See, Meachum v. Fano, 427 U.S. 215, 224 (1976).

In Sandin v. Conner, supra, the Supreme Court held that inmates are not deprived of a liberty interest and, therefore, are not entitled to the protections set forth in Wolff, unless they are

subjected to disciplinary measures which involve the type of atypical, significant deprivation by which a State might conceivably create a liberty interest. Id. at 2301. The Court went on to hold that a State prisoner had no procedural due process right to present witnesses at a Disciplinary Hearing which resulted in a sanction of 30 days of segregation. In this respect, the Court noted that "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." Id.

The Court reasoned that an inmate's discipline, in segregated confinement, "did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." Id. Notably, the Court's decision in Sandin reversed the trend started in Hewitt v. Helms, 459 U.S. 460, 474 (1983), which "shift[ed] the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, * * * encourag[ing] prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." Id. at 2299.

B. Legal Analysis. Here, the Petitioner's sanctions include loss of commissary privileges, loss of job placement, short periods of administrative segregation, and loss of good time credit. We believe that the loss of commissary privileges, the loss of job

placement, and the short periods of administrative segregation, do not constitute an "atypical and significant hardship," when compared to the circumstances of ordinary prison life. See, Van Winkle v. Boniecker, 243 F.3d 552, 2000 WL 1838219 at *1 (9th Cir. December 4, 2000)(unpublished)(denial of a prison job not an atypical and significant hardship); Bernel v. Black, 221 F.3d 1338, 2000 WL 1039324 at *2 (7th Cir. July 25, 2000)(unpublished)("no protectible liberty or property interest in maintaining a prison job"); Malchi v. Thaler, 211 F.3d 953, 958 (5th Cir. 2000)("Clearly, Malchi's thirty-day loss of commissary privilege * * * do[es] not implicate due process concerns."); Hemphill v. Delo, 124 F.3d 208, 1997 WL 581079 (8th Cir. September 22, 1997)(four days in housing unit, 30 days in disciplinary segregation, and 290 days in administrative segregation, without more, do not implicate a liberty interest). With respect to the loss of good time credit, which may well implicate due process concerns, we believe that the Petitioner was afforded due process in regard to the imposition of the sanctions.

The Record clearly reflects that the Petitioner was afforded adequate process with respect to the two incident reports for which he was sanctioned by a loss of good time credit. For both Hearings, the Petitioner was read his rights, and was given a copy of the investigative report prior to the Hearing. See, DHO Report for

Incident #705765, and DHO Report for Incident #718022, Attachments D & F to Declaration of Susan Pedersen, Attachment 10 to United States' Attachments 1-13 [Docket No. 13]. The Record shows that the Petitioner did not request a staff representative, see, id., but he did provide a list of questions which he requested to be asked of the witnesses at the Hearing on Incident Report #705765. Id. The Petitioner's written statement was received, and considered, by the DHO. Id. For the Hearing on Incident Report #705765, the Petitioner listed questions to be asked of three witnesses: one inmate and two BOP medical personnel. Id. The Record reflects that the inmate, whom Petitioner sought to question, was present at the Hearing, and that the Petitioner's questions were asked of him. Id. The two medical staff members submitted written memoranda, addressing the Petitioner's questions, which were read to the Petitioner at the Hearing. Id. Moreover, other than the Petitioner's bald assertions, there is no evidence that staff falsified the charges or discriminated against him, in any respect, during the disciplinary process.

Moreover, the evidence submitted in both Hearings was that the Petitioner was offered the PPD, but that he did not offer a verbal response or other form of acknowledgment or consent to the test. He, therefore, refused to allow the test, and was cited for refusal to accept a program requirement. At the Hearing, the Petitioner

cited religious reasons for refusing the PPD test, but stated that he would submit to a chest x-ray or a sputum test. There was also testimony regarding the fact that alternative forms of testing, such as chest x-rays, or sputum tests, were only used in cases of contraindications. Id.[7] Thus, on this Record, there is some evidence to conclude that the Petitioner did, indeed, fail to submit to the PPD test, as requested. On this Record, there is no reason to believe that the Petitioner's due process rights were in any way violated, as he was accorded the process due to him under Wolff. Thus, we recommend that the Petitioner's Petition for Writ of Habeas Corpus be denied, in its entirety.

NOW, THEREFORE, It is --

---

[7]In regard to Incident Report #718022, the Petitioner apparently decided to take the PPD test a few days after receiving the incident report. He, therefore, argued that the incident report should be dismissed, as he contended that another inmate had taken the PPD test under similar circumstances, after receiving an incident report, and that his report was dismissed after he submitted to the test. The Petitioner therefore believed that he should receive the same treatment. However, the Petitioner did not present evidence regarding the circumstances of the other inmate's case at the Hearing. The Hearing Officer correctly noted that she did not know the circumstances of the other individual's case, and that for this Petitioner, the incident report constituted a repeat offense. See, DHO Report for Incident Report #718022, Attachments F to Declaration of Susan Pederson, Attachment 10 to United States' Attachments 1-13 [Docket No. 13].

ORDERED:

That the Petitioner's Motion for Issuance of a Report and Recommendation [Docket No. 16] is GRANTED.

AND, It is --

RECOMMENDED:

That the Petition for Writ of Habeas Corpus [Docket Nos. 1 and 5] be DENIED.

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**N O T I C E**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than June 21, 2001**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no**

**later than June 21, 2001,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.